The act of the legislature, entitled "An act to establish a Metropolitan Police District and to provide for the government thereof," is, by these proceedings, alleged to be unconstitutional. That act having received the sanction of the legislature and of the executive department of the government, is clothed with all the forms of law. Nevertheless, if its provisions are, directly or by necessary implication, repugnant to the constitution, it is the province and duty of the courts so to declare it. But if the law should be found to be within the competency of the legislature, however much we may doubt the policy or wisdom of the enactment, it is our duty to uphold it and vindicate the legislative power. It is needless to say the judicial records *Page 549 
of this court show that we have never shrunk from the performance of this duty on just occasions.
The constitution vests all legislative power in the senate and assembly, with certain restrictions and limitations imposed on that body by the constitution itself. Independent of those limitations, the legislative power is omnipotent within its proper sphere. The legislature, in this respect, is the direct representative of the people, and the delegate and depositary of their power. Hence, the limitations of the constitution are not so much limitations of the legislature as of the power of the people themselves, self-imposed by the constitutional compact. When the court declares a law unconstitutional, it in effect declares that the sovereign power of the people has so far been abdicated by themselves. This consideration has led the courts, in all governments which are based on the theory that all power resides in the people, to give a strict construction to compacts which deprive the people of this sovereign power. It will not be presumed that they intended to abdicate their power, unless they have so declared in express terms or by necessary implication. These principles are fundamental, conservative, and cannot be disregarded without infringement upon the reserved rights and power of the people. Hence, the courts have frequently and uniformly declared that they will not adjudicate a law unconstitutional when it is to be made so by inferences or presumptions only, or when the question rests in doubt. Any other rule of construction would bring the legislative and judicial branches of government into collision, to the ruin of one or both.
The wisdom of the conservative maxims of the courts is further exhibited by the consideration that the legislatures are chosen at frequently occurring elections and for short terms. Hence, if they err in expressing the wants of the people, or exceed their powers, the error or excess may be quietly and quickly corrected by the people themselves, through subsequently elected representatives. But if this *Page 550 
court wanders from its judicial orbit, and in its progress collides with a coördinate power, when moving in its legitimate sphere, who shall restore the system to harmony and regulate its dynamical forces? Such collision must terminate either in judicial revolution or new constitutional compacts.
The appellant's counsel base their objection to the law mainly upon its supposed repugnancy to the second section of the tenth article of the constitution, which declares that "All county officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of the respective counties, or appointed by the boards of supervisors or other county authorities, as the legislature shall direct. All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose. All other officers, whose election or appointment is not provided for by this constitution, and all officers whose offices may be hereafter created by law, shall be elected by the people or appointed asthe legislature may direct."
This objection, when reduced to its last analysis, is, that the officers, created by the act in question, should have been directed to be elected by the people of the district or appointed by the local authorities thereof; and as it does not, but confers that power upon the executive of the state, it violates the constitution in respect to the mode of appointment. To this objection it is answered, that these officers are neither county, town, city or village officers, but paramount, in respect of territorial limits and jurisdiction and duties, to any of them.
We are of opinion this answer is legitimate. The limits of the metropolitan police district extend to, and embrace four counties, including two large and contiguous cities, and intervening rivers and harbors. Within this extended district, *Page 551 
all the lesser civil divisions of the state are, for the purposes of police regulation and action, obliterated, but left intact for all other governmental purposes; and the several divisions elect or appoint their local officers as heretofore. We cannot say, therefore, that the provisions of the constitution, in this respect, have been disturbed. Indeed, it is certain they have not. But it is said that if the legislature may erect new districts of territory, other than those mentioned in the constitution, they may defeat the intention of that instrument, in respect to the mode of electing or appointing to office. This argument may have much force to prove the constitution defective in its provisions against its own subversion by the people themselves, by virtue of their reserved legislative power. But it does not advance one step in proving the power or duty of this court to interpose the judicial shield between the people and the constitution, when the latter has been left defective, either intentionally or inadvertently. We cannot make judicial supplements to that solemn compact. We are the depositaries of no such power. But the possibility of infringing upon the existing manner of electing or appointing officers is greatly overstated by counsel. In all the three great departments of government, the executive, legislative and judicial, the offices, and the mode of electing the officers to fill them, are fixed by the constitution in such clear and definite language as to exclude all other offices and modes of appointment in competition with, or substitution for them. It declares that the legislative power of the state shall be vested in a senate and assembly. (Art. 3, § 1.) The executive power shall be vested in a governor, (Art. 4, § 1), and the whole judicial power is so parceled amongst the several courts, and the mode of selecting the judges by election so specifically pointed out, that no doubt can exist, that, not only the mode of selecting the officer, but the duty of the officer, is exhaustive of that function of government, and excludes all idea of a reserved power on this subject, save *Page 552 
as provided by the twenty-third section of the sixth article, in respect of the creation of tribunals of conciliation, and section five of the same article, which confers upon the legislature power to "alter and regulate the jurisdiction and proceedings in law and equity, as they had possessed it theretofore." So, in respect of the officers of state, such as secretary, comptroller, treasurer, attorney-general, state engineer and surveyor, canal commissioners, inspectors of state prisons, c., the mode of appointment, and in most cases the duties of the office are fixed, and cannot be altered, or transferred, or abolished by the legislature. So, too, the several counties have the imperative right to choose sheriffs, clerks, coroners and district attorneys, every three years. (Art. 10, § 1.) These offices cannot be abolished, therefore, nor the mode of their appointment changed. Nor can the common law duties pertaining to those offices, so far as the names of the officers are descriptive of them, be abrogated in any material respect or transferred to others. (Warner v. The People, 2 Denio, 275.) I know the court seem to admit, in the case above cited, that the legislature might abolish the office of clerk, or transfer a portion of his duties to another officer. However it might be held, under the constitution of 1821, in respect to abolishing the office, the present constitution, by its tenth article, would seem to confer a perennial power upon the counties, and to command its exercise. "Sheriffs, c., shall be chosen once in three years, and as often as vacancies shall happen."
This review of the constitution, from the standpoint of fear of its subversion, ought to remove the excessive alarms of those who tremble for its safety. If some small modicum of power to appoint to office is left in the executive, its exercise will not be felt in its contact with the great mass of power conferred by election and local appointments.
We have, thus far, examined the constitution for the purpose of finding an express or necessarily implied prohibition of the legislation in question; and, having found none, the *Page 553 
constitutionality of the law follows as a necessary result. But this does not exhaust the subject, nor do justice to the other side of the question, viz., the affirmative power implied in the last clause of the second section of the tenth article: to create new offices and to direct the mode of their appointment. By that clause of the constitution, "all other officers whose election or appointment is not provided for by this constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people, or appointed as the legislature maydirect." This clause provides for two contingencies: First. Officers whose offices were created or recognized as existing by the constitution, but whose mode of induction was not prescribed by that instrument; and, Secondly. Offices newly created by the legislature, other than county, town, city and village offices. These provisions make it evident, the people, in adopting the constitution, meant to reserve to themselves, through their immediate representatives, the right to create new offices to meet the wants and exigencies of a great and growing state. The wise and experienced statesmen who framed and recommended this provision for adoption, well knew that no human provision could foresee all the wants and dangers of twenty years of the future, for which time they hoped the instrument they had formed might endure. (Art. 13, § 2.) The science of sociology teaches the wisdom of such a provision, in all forms of government which hope for perpetuity. When the whole frame of government is cast in an iron mould, every desire of renovation is treason, and every change is revolution. Hence, to allow a verge for unforeseen contingencies is wisdom, as flexibility is strength.
Upon this construction of the constitution, the legislature have acted, ever since its adoption; by creating the offices of pilots; commissioners for almost every conceivable object, both general and local; harbor masters; auditor of the canal department; state reporter; wreck-masters; notaries public, and numerous others. The power of creating new offices *Page 554 
and filling them by appointment by the governor, in conjunction with others, was exercised by the first legislature convened under the constitution, and has never been questioned in the courts until now. If the power were doubtful, contemporaneous construction, and continued action under it without objection, go far to prove the assumed construction to have been legitimate and in harmony with the other provisions of the instrument, in the judgment of the people.
But it is said that the offices heretofore created by the legislature were mere agencies, ephemeral in duration and insignificant in power. If this were so, it would not vary the question, nor validate the inference sought to be drawn from it. The question is one of power, and not its abuse or excess. But an examination of the various offices, above referred to, will prove that, both in importance and duration, if they do not equal they do not much fall short of those created by the police act.
Another argument urged by the appellant's counsel is, that if the last clause of the second section has reference to local offices or officers (which they deny), then the words, "by the authorities thereof," should be interpolated after the word "appointed," so as to confine the power of appointment to the local authority of the city or village. But this construction ought not to prevail, for two reasons: First. It is evident the constitution was not intended to limit the power of appointment to the local authority, or the framers would have inserted the limitation which we are asked to interpolate, and which the framers had just used in the preceding clause. They understood the value and power of words; and, in a document of so solemn a character, must be deemed to have both weighed and counted them. The omission of those words of limitation is therefore expressive of an intent not to confine the appointing power to the local authority.
The second answer to this argument is, that the last clause of the section did not confine its provisions to local offices *Page 555 
only, but had in contemplation all officers, whether general or local, whose election or appointment has not already been provided for in the constitution; and also officers to fill offices thereafter to be created, other than county, town, city and village offices. But, as this argument was not much pressed, I will not further answer it, or do more than allude to the dangerous consequences of interpolating new provisions into a fundamental law.
The appellants' counsel further urge that the law in question was enacted by the legislature, in the form it is, to evade the constitutional provisions, but in fact to deprive the city of New-York of the right to choose their own police officers, and to draw patronage to the central power. These are grave charges, and, if true, subject the individual members of that body to impeachment. I will not say that a law may not be so palpably evasive of constitutional provisions, that it would be the duty of the courts to pronounce the law void; not, however, because the legislature intended to evade, while they violated, its provisions, but because they had not succeeded in the evasive effort. We are not made judges of the motives of the legislature; and the court will not usurp the inquisitorial office of inquiring into the bona fides of that body in discharging its duties.
Looking at the provisions of the act, and comparing them with the offices heretofore existing prior to the constitution, they create offices heretofore unknown, in respect to territory, powers, duties, duration, succession and combination. It is true there had existed officers prior to the constitution, who performed similar duties in limited sections of this whole territory; but no one of them, nor all combined, had the powers conferred by this act. The power and facilities afforded by this act seem well calculated to effectuate the great objects of a police force; and if the right of election or appointment of this force had been conferred upon the local authorities, I doubt not it would have been hailed by *Page 556 
the citizens of New-York as a well devised law, adapted to their pressing wants. But being a newly created office, and other than a county, town, city or village office, I am clearly of the opinion the legislature could direct the mode of the appointment.
Of one thing I am fully persuaded. If the legislature had not, in this case, the power to create new offices, under the clause of the constitution before cited, no cases can possibly arise which will authorize them to do so.
The city of New-York is the commercial metropolis of this continent; its port is filled with shipping from every clime; its streets crowded with residents and sojourners, intent on business, pleasure and crime; and through its gates, into the interior of the state, come swarming myriads of emigrants, from every kindred, tongue and people of the old world. And how have the local authorities of that great city discharged its duty of local government to its citizens and the state at large, in protecting them in their liberty, life and property? Let the statistics of crime answer, and convict that authority, either of remissness in duty, or the system of police hitherto in force as radically defective. But let the cause be what it may, which has paralyzed the arm of criminal law, the state is bound to protect the citizen in his life and property, irrespective of locality; and if, in the judgment of its representatives, the local authorities have failed to accomplish this object, it was their duty to substitute another system more effectual in execution.
There is no error in the judgment, and it should be affirmed.